**Opinion issued June 5, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00020-CV**

———————————

**TANNOS DEVELOPMENT GROUP, LLC AND LONE STAR
WILDERNESS TRAILS ESTATES, LLC, Appellants**

**V.**

**GALVESTON COUNTY CONSOLIDATED DRAINAGE DISTRICT,
Appellee**

---

**On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Case No. 24-CV-2406**

---

## MEMORANDUM OPINION

This case involves one drainage district, a few thousand loads of dirt, and a

civil procedure rule that puts strict requirements onto temporary injunction orders.

When the district discovered large amounts of dirt being deposited on a local tract

of land, it concluded that it was seeing "construction" activity, which requires preclearance under its published regulatory manual. Because the developer had not obtained such preclearance, the district fined the developer $3.4 million for past violations and sought an injunction to prevent more dirt from piling up in the future.

After a hearing, the trial court ruled that the dirt work counts as construction. It signed an order saying so and granting the temporary injunction. The order bars the developer from several activities, including "work on the property in furtherance of anything covered by" some plans in an email "admitted as Plaintiff's Exhibit 11." The developer now assails the order on numerous grounds:

1. Piling up dirt is not "construction" and requires no permission.

2. An interlocal agreement outsourced oversight from the district to the City of Friendswood, which gave the work a green light.

3. The equities do not favor injunctive relief.

4. The district failed to show irreparable harm.

5. The order fails to satisfy Texas Rule of Civil Procedure 683.

The $3.4 million fine is not before us. We face only the injunction.

We dissolve the trial court's temporary injunction.

## Background

In flat areas near the coast, the issues of drainage and flooding constitute serious business. They can implicate important policy issues and spark strong

feelings among neighbors. A man's castle may become his island, if not his swamp, when neighboring castles go too far in altering local drainage patterns.

Galveston County, home to waterways like Clear Creek and Chigger Creek, is also home to the Galveston County Consolidated Drainage District, created under Texas Water Code Chapter 56. By law, the district has the power to adopt a master drainage plan, as well as rules relating to adequate drainage or flood control. *See* TEX. WATER CODE § 49.211(c). It has exercised that power by publishing a Drainage Criteria Manual, which lays out a scheme for seeking and obtaining approval before engaging in certain kinds of projects.

The district's jurisdiction includes the Galveston County part of the City of Friendswood. As is common in cases of overlap between local governmental units, the district and the city have entered into an interlocal agreement. Their agreement sets forth "City Responsibilities" and "District Responsibilities" for purposes of regulating drainage and flood control.

The developer, Tannos Development Group, says that it is one of the largest real estate developers in the county. To move ahead with a 106-acre mixed-use project called Friendswood City Center, the developer decided to transport some of the dirt being excavated in that part of Friendswood to Wilderness Trails,[1] a Tannos

---

[1] Wilderness Trails is a proposed subdivision development located on a 40-acre tract of land. Lone Star Wilderness Trails Estates, LLC currently owns the property.

project in a different part of Friendswood. The developer views this dirt relocation as a way to stockpile dirt economically, reducing costs and the amount of public bond revenues needed, thus saving money for city taxpayers.

That sunny view, however, is not shared by the district. The district sees the matter as construction work within the meaning of the manual, and hence an activity that requires district approval. According to the district, the developer had approached it earlier with drainage plans for Wilderness Trails but was denied permission and simply blazed ahead in open violation of roughly a dozen sections of the manual every day. With each daily violation subject to a fine of up to $1,000, the district calculated the fines due as $3.4 million.

The dispute quickly went to court. The district sought a declaration about the applicability of the manual to the work. It also sought a temporary injunction. At the injunction hearing, the district portrayed the case as a simple one of a duly created drainage district and its duly elected board members being brazenly ignored by a developer.

The developer countered that there is no construction going on at Wilderness Trails—just the temporary stockpiling of some dirt. The developer felt that the manual says nothing about stockpiling dirt, that the interlocal agreement relegates this particular issue to the City of Friendswood (which duly approved the work), and that the board's decisions appear suspect because of a personal conflict of interest.

4

The trial court held an evidentiary hearing on the district's request for a temporary injunction. The district called its engineer and then promptly rested. The developer called the city engineer, the city manager (who is an engineer), an outside engineer, and Louis Tannos. At the end of the hearing, the court granted the injunction. Several of the order's sections warrant quotation because the developer challenges the order's form as inconsistent with Rule 683:

2. The Property is located near other residential areas and drains into Chigger Creek.

3. Fill is being trucked by dump trucks to the Property. One or more of the Defendants testified that they are placing fill on the Property that they are relocating from another site in Harris County pursuant to a permit that was issued by the City of Friendswood but was not submitted to, nor was it approved by, GCCDD.

. . . .

6. GCCDD has a published manual called the GCCDD District Drainage Criteria Manual (the "**Manual**"). No party claimed that any of the rules or procedures in the Manual were unreasonable with respect to construction activities on the Property. The GCCDD engineer testified that the installation of the fill does not comply with the Manual. By November 18, 2024, GCCDD gave notice to Defendants that it believed the Defendants were in violation of District rules. Defendants kept on delivering fill to the Property thereafter.

7. The parties disputed whether placing fill was a construction activity. The Court finds that placing fill material on the Property is a construction activity even though it is not the erection of a building or the creation of a structure. Construction activities reasonably include modifications to a property by the addition of fill even if at some later date it may be modified, altered and/or removed. As Defendants proved they intend this fill to remain on the Property.

8. While the parties disputed the drainage impact of the fill it is possible that a pile of dirt that the Defendants proved may eventually be 10' tall

5

could impact drainage in a material way. The Court is generally aware that water drains downhill. It was not unreasonabl[e] for GCCDD to believe that this amount of fill could impact drainage.

9. GCCDD has jurisdiction over this Property and irreparable harm would occur if GCCDD were not entitled to review, comment and potentially approve the Project under the procedures outlined in the Manual. Irreparable harm would also occur if Defendants were not required to follow the procedures in the Manual as GCCDD is obligated to treat all citizens equally in enforcing the Manual; thus, Defendants would irreparably harm GCCDD if they were allowed to avoid the rules, requirements and procedures of the District.

10. For purposes of this ruling, GCCDD has a substantial likelihood of success on the merits.

11. Unless the Defendants are enjoined, the Plaintiff will have no adequate remedy at law.

12. The harm to Plaintiff is imminent as the Defendants intended to continue adding more fill to the Property and stopped only with the issuance of the TRO.

It is, therefore, ORDERED, ADJUDGED and DECREED that Defendants are restrained from conducting any operations on the Property that are related to delivering, moving, rolling or compacting dirt, altering the grade or drainage of the Property, or performing any work on the Property in furtherance of anything covered by the plans submitted to GCCDD in the email from Kat Ambrose to Scott Sheridan on or about Wednesday, December 18, 2024, at 8:57 a.m. that was admitted as Plaintiff's Exhibit 11.

. . . .

It is therefore ORDERED that this matter be set for trial on September 22, 2025, at 10:00 a.m.

This appeal followed.

## Validity of Temporary Injunction

The law relating to temporary injunctions is strict and straightforward. It is strict because of the due process concerns that come with granting someone relief

6

before the parties have tried the case, and it is straightforward because most of the underlying principles appear as positive law in Rule 683 and Civil Practice and Remedies Code Chapter 65. *See also In re Luther*, 620 S.W.3d 715, 723 (Tex. 2021) (orig. proceeding) (per curiam) ("Our cases likewise require strict compliance with Rule 683, so that a temporary restraining order itself informs a party, unambiguously and with a reasonable degree of specificity, of the conduct to be restrained."). We will lay out the basic tenets of temporary injunction law and then apply them to this case.

## A. Legal Requirements

The purpose of a temporary injunction "is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

To obtain a temporary injunction, an applicant need not establish that it will prevail upon a final trial on the merits, but it must plead and prove that it (1) has a cause of action against the opposing party, (2) has a probable right on final trial to the relief sought, and (3) faces probable, imminent, and irreparable injury in the interim. *Id.*; *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

To establish irreparable injury, the applicant must show that it cannot be "adequately compensated in damages" or that the damages "cannot be measured by

7

any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. In other words, the applicant must establish it has no adequate remedy at law. *McGlothlin v. Kliebert*, 672 S.W.2d 231, 232 (Tex. 1984).

Although the decision whether to grant a request for a temporary injunction is committed to the trial court's sound discretion, once the court decides to grant relief, the order must comply with Rule 683, which governs the form and scope of injunctions and temporary restraining orders. *See* TEX. R. CIV. P. 683; *Clark*, 651 S.W.3d at 366 (discussing Rule 683's requirements); *Conlin v. Haun*, 419 S.W.3d 682, 685–86 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (same).

The law imposes strict requirements about the order's form. Rule 683 says that the order must state the specific reasons for its issuance; it must specifically set forth the reasons that irreparable injury will result absent an injunction preserving the status quo pending a trial on the merits, and it must "describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." TEX. R. CIV. P. 683; *Clark*, 651 S.W.3d at 366. The prohibited conduct must therefore appear in the injunction order itself, not in some "other" document. *See* TEX. R. CIV. P. 683.

These requirements are mandatory: an order that violates Rule 683 "is subject to being declared void and dissolved." *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam); *Clark*, 651 S.W.3d at 366.

**B.      Whether the Temporary Injunction Complies with Rule 683**

When measured against these demands, the temporary injunction order here comes up short.

**1.      Reference to another document**

First, the order prohibits particular acts purely by reference to an extrinsic document. It forbids the developer from "performing any work on the Property in furtherance of anything covered by the plans submitted to GCCDD in the email from Kat Ambrose to Scott Sheridan on or about Wednesday, December 18, 2024, at 8:57 a.m. that was admitted as Plaintiff's Exhibit 11."

This prohibition runs squarely afoul of Rule 683, which rejects any form of incorporation by reference: "Rule 683 requires that the order itself specify the acts sought to be restrained, without reference to another document." *In re Luther*, 620 S.W.3d at 723; TEX. R. CIV. P. 683. Hence, the order cannot stand.

**2.      Failure to be specific in terms**

Second, the order does not state what the harm is or why irreparable injury will occur absent an injunction. Paragraph 9 of the order says that "irreparable harm would occur if GCCDD were not entitled to review, comment and potentially approve the Project under the procedures outlines in the Manual." However, it fails to say what the harm would be. Perhaps the order envisions the harm as flooding or material changes in drainage, but it never actually says that. The closest it comes is

9

paragraph 8, which says that "it is possible" that piles of dirt "could impact drainage in a material way," or that the district reasonably could have concluded "that this amount of fill could impact drainage." One cannot build a temporary injunction on a foundation of the "possible" or the "could."

Nor does the evidence presented at the hearing prove anything beyond the "possible" or the "could." It certainly cannot support a finding that the existing piles of dirt will materially impact drainage. The district's engineer testified about what "could" take place, but that is as far as he went:

> Q. What's the impact of all the fill that's been trucked onto the site?
>
> A. So, we don't know where they're placing it because we haven't had an opportunity to review an approved plan. It could be in the flood plain which—so, we haven't had an opportunity to review any sort of plan regarding their fill. It could be being placed in the floodplain, which would have an adverse impact to the water surface elevation in Clear Creek.
>
> . . . .
>
> Q. How does the grubbing of the site impact drainage in the area?
>
> A. When you remove the tree canopy or foliage it has impact and how it infiltrates and dissipates the water and how much runs off.
>
> Q. Is it potentially harmful to other citizens of the jurisdiction?
>
> A. Potentially, yes.
>
> Q. I know this may be—seem obvious, but how is it potentially impactful to the others?
>
> A. It could increase the water surface elevations during storm events, cause flooding.

After all these references to what "could" result, he was asked directly whether he knows one way or the other:

Q. So, the harm that you mentioned, you said that the stockpiling might impact drainage, correct?

A. Correct.

Q. You don't know if it actually will impact drainage?

A. Yeah. I haven't seen a plan. So, I don't know a hundred percent what they're doing.

Q. So, the answer is, "Yes"?

A. I don't know either way. Correct.

Citing the engineer's testimony from a few pages earlier, the district contends on appeal that the developer's actions "will likely impact drainage." But the most that the cited testimony says is that the dirt "might impact drainage." If that were enough, an injunction would almost always be available. Read fairly, the evidence fails to show the likelihood of a material impact on drainage. Accordingly, the order's finding that the dirt work "could impact" drainage fits with the evidence but falls short of establishing irreparable injury.

In defense of the temporary injunction, the district advances the proposition that "Water flows downhill." But that largely just restates the law of gravity. If the law of gravity were enough, it would justify stopping nearly any industrial activity. The district also points out that in holding a permanent injunction too broad, the supreme court's decision in *Huynh v. Blanchard* said that an expert agency's views

11

"should be a court's starting point in determining what restrictions are necessary to abate nuisance-level odors."  694 S.W.3d 648, 701 (Tex. 2024).

First, *Huynh* involved a permanent injunction after a full jury trial with an expansive record.  *See id*. at 671 ("The Neighbors ultimately tried their case to a Henderson County jury in October 2019.").  It did not seek to ground an injunction on the testimony of a single witness who candidly admitted that he did not know whether the activity would actually impact drainage.  Second, the quoted passage in *Huynh* addressed how broad and how harsh a permanent injunction needed to be, not the distinct and antecedent question whether a temporary injunction had adequate support in the record.

For these reasons, the temporary injunction is infirm and must be dissolved. *See Clark*, 651 S.W.3d at 372–74 (dissolving temporary injunction when order required reference to other document and failed to explain why irreparable injury will result); *Beachsiders, LLC v. Vaughan*, No. 01-23-00485-CV, 2023 WL 8262771, at *7–8 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.) (mem. op.) (dissolving temporary injunction because order lacked specificity); *Home Asset, Inc. v. MPT of Victory Lakes FCER, LLC*, No. 01-22-00441-CV, 2023 WL 3183322, at *2–4 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (mem. op.) (similar); *Six Bros. Concrete Pumping, LLC v. Tomczak*, No. 01-21-00161-CV, 2022 WL

12

17981577, at *5–6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op. on reh'g) (similar).

We need not decide whether the work is "construction activity" under the manual, whether the interlocal agreement with the City of Friendswood has any relevance, or whether the trial court acted within its discretion in deciding how the equities tilt. We hold only that the injunction is infirm. That holding resolves the appeal. *See Selvera v. Chavarria*, No. 14-22-00477-CV, 2023 WL 4446719, at *2 n.2 (Tex. App.—Houston [14th Dist.] July 11, 2023, no pet.) (mem. op.) ("Because this is an interlocutory appeal of the probate court's order granting temporary injunction, only that order is before this court—not the entire trial-court case. We do not remand the case to the trial court because the case is not before us.").

### Conclusion

We dissolve the temporary injunction.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

13